**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| LASSISSI AFOLABI, | : | |
| | : | Civil Action No. 13-1686 (JLL) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |

**LINARES**, District Judge:

Presently before the Court is the motion of Lassissi Afolabi ("Petitioner") to vacate, set aside, or correct his conviction. (ECF No. 1). Petitioner filed his motion on or about March 14, 2013. (ECF No. 1). Following this Court's order to answer, the Government filed a response (ECF Nos. 9-12), to which Petitioner has replied. (ECF No. 13). For the following reasons, this Court will deny Petitioner's motion, and will deny Petitioner a certificate of appealability.

## I. BACKGROUND

"From October 2002 through September 2007, [Petitioner] conspired with his wife. . . and others to commit forced labor of more than 20 girls, aged 10 to 19. They recruited the girls from impoverished villages in Togo and Ghana and brought them to the United States with fraudulently obtained visas. The girls were required to work in hair-braiding salons for up to 14 hours per day, six or seven days a week, and to relinquish all of their earnings. They were beaten and psychologically and sexually abused." *United States v. Afolabi*, 455 F. App'x 184, 185 (3d Cir. 2011). Based on his part in this conspiracy, Petitioner was indicted for conspiring to harbor illegal aliens for the purpose of commercial advantage and financial gain on October 4, 2007. (Docket No. 07-785 at ECF No. 22). On January 15, 2009, Petitioner was charged by way of a superseding

indictment with a multi object conspiracy to commit forced labor, trafficking for forced labor and document servitude; committing the forced labor of five young women including the aggravated sexual abuse of two of those individuals; trafficking with respect to forced labor in connection with those same five victims and again including the aggravated sexual abuse of two of them by Petitioner; conspiring to harbor illegal aliens for commercial advantage and private financial gain; and transporting a minor with the intent to engage in criminal sexual activity. (Docket No. 07-785 at ECF No. 41).

Following several pre-trial motions, Petitioner came before this Court to plead guilty pursuant to a plea agreement he entered into with the Government. (*See* Docket No 07-785 at ECF No. 119). Pursuant to the plea agreement, Petitioner was to plead guilty to "Counts 11, 13, and 23 of the Superseding Indictment . . . which charges [Petitioner] in Count 11, with conspiracy to commit forced labor, trafficking with respect to forced labor, and document servitude, contrary to 18 U.S.C. §§ 1589, 1590, and 1592, in violation of 18 U.S.C. § 371; in Count 13, with providing and obtaining the forced labor of P.H. in violation of 18 U.S.C. §§ 1589 and 2; and in Count 23, with traveling for the purpose of engaging in illicit sexual conduct with S.X, in violation of 18 U.S.C. §§ 2423(b) and 2." (Docket No. 07-785 at ECF No. 122 at 1). In exchange for this guilty plea and compliance with the terms of the plea agreement, the Government in turn agreed to initiate or pursue any other criminal charges against Petitioner based on the conspiracy in which he and his wife engaged. (*Id.*). The Government also agreed to dismiss the remaining counts eight of the Superseding Indictment which applied to Petitioner. (*Id.*).

In the plea agreement, Petitioner was also directly informed of the potential sentencing exposure he faced on the charges to which he agreed to plead guilty. (*Id.* at 3). Specifically, Petitioner was informed that he faced a statutory maximum of 5 years as to Count 11, a maximum

2

sentence of life under Count 13, and a maximum sentence of thirty years under Count 23. (*Id.*).

Petitioner was further informed that his sentence would be subject to the sole discretion of this

Court under the Sentencing Reform Act and this Court's consideration of the applicable sentencing

guidelines, and that as a result Petitioner could receive any sentence up to the maximum term of

imprisonment and the maximum fine if this Court so decided. (*Id.*). Petitioner was also informed

of the supervised release terms, fees, and fines he would face because of his guilty plea. (*Id.*).

Pursuant to the stipulations contained in the agreement, however, the parties agreed that

Petitioner's offense level under the guidelines would be 32, which included a two level reduction

for acceptance of responsibility. (*Id.* at 8). Petitioner and his counsel signed this agreement on

August 11, 2009. (*Id.* at 5).

Petitioner first appeared before this Court with the intention of pleading guilty on August

25, 2009. (Docket No. 07-785 at ECF 123). At that first hearing, Petitioner stated that he had had

an opportunity to discuss the plea with his counsel, but had not had the opportunity to go over the

entire plea agreement in his native language as opposed to English, the language in which

Petitioner and his attorney most frequently communicated. (*See Id.* at 8-9). Although Petitioner

asserted he needed no additional time, this Court ordered that counsel and the interpreter present

for the hearing go over the plea agreement with Petitioner again in his native language to ensure

that Petitioner understood the terms of the agreement out of an abundance of caution. (*Id.* at 10).

The following day, on August 26, 2009, Petitioner returned and again requested that he be

permitted to plead guilty. (*See* Docket No. 07-785 at ECF No. 124). At the outset of that hearing,

Petitioner's counsel stated that he and Petitioner had again gone over the plea agreement with the

aid of an interpreter, and that Petitioner still wished to plead guilty. (*Id.* at 3). Petitioner also

confirmed that he had discussed the agreement with counsel and the interpreter, that counsel had

3

answered all questions he had regarding the agreement to Petitioner's satisfaction, and that he still wished to enter a guilty plea. (*Id.* at 4-6). Petitioner also confirmed that he had no problems understanding the Court, and had no further questions for counsel. (*Id.* at 6). Petitioner further stated that the only medication he was on was for blood pressure. (*Id.* at 7-8).

This Court then discussed the plea agreement with Petitioner. Petitioner stated that he had read the letter and discussed it in detail with his attorney, that he was satisfied with his attorney, and that he understood that this Court would not be bound by the agreement if Petitioner pled guilty. (*Id.* at 8-9). Petitioner further stated that he understood that he was willingly pleading guilty to three felonies, which would carry collateral consequences. (*Id.* at 9-10). This Court then specifically stated that, by pleading guilty, Petitioner would "lose some valuable civil rights that [he] may have and [he] may also be subject to problems with Immigration and they may deport [Petitioner]" which Petitioner stated he understood. (*Id.* at 10).

After the parties put the terms of the agreement on the record, this Court conducted a plea colloquy with Petitioner. During that colloquy, Petitioner stated that he understood that he was waiving his rights to a jury trial by pleading guilty, including his right to testify in his own defense and to cross-examine any witnesses against him. (*Id.* at 12-13). Petitioner also stated that he understood that the Court would sentence him after consulting the Sentencing Guidelines, and that Petitioner would not be permitted to retract his plea if this Court elected to sentence him to a sentence different than that asserted in the plea agreement or estimated by counsel or the Government. (*Id.* at 13-15). Petitioner also stated that he fully understood the appellate and collateral waivers contained in his plea agreement. (*Id.* at 15-16). Petitioner also understood the maximum penalties which he faced based upon his guilty plea, which this Court explained in detail and which Petitioner stated had previously been explained by his attorney. (*Id.* at 16-20).

4

After this Court explained to Petitioner the elements the Government would have had to prove had the matter proceeded to trial, Petitioner, the Government, and defense counsel engaged in a lengthy and detailed colloquy establishing the factual basis for Petitioner's plea. During that colloquy, Petitioner admitted that he and his former wife brought several girls from Togo and Ghana to the United States, and put them to work in hair braiding salons working six or seven days a week. (*Id.* at 23-28). Petitioner also testified that he and his wife did not pay the girls for their work in the hair braiding salons, and did not allow them access to any tip money they earned. (*Id.*). Petitioner further stated that, when not working in the salons operated by his wife, the girls were placed in other salons, but any money they earned passed to Petitioner and his wife. (*Id.*). Petitioner further testified that, on those days when they were not working in salons, the girls were also frequently taken into the city to hand out flyers for the salons. (*Id.* at 27-28). Petitioner further stated that the only money the girls received was for food and transportation to and from the salons, although he did take the girls shopping for clothing at times. (*Id.* at 28).

Petitioner also testified that the girls were subject to rules put in place by his wife. The girls were not allowed to earn money, any money they did earn passed to Petitioner and his wife, the girls were not permitted to go anywhere without his permission, and limitations were placed on the girls' ability to date or make friends. (*Id.* at 29-30). Petitioner also stated that the girls were not permitted to contact their families in Africa. (*Id.* at 30-31). Petitioner then testified that, if the girls did not comply with these rules, he would punish them, including hitting the girls. (*Id.* at 32-33). Petitioner further stated that the younger girls were not permitted to attend school. (*Id.*). Petitioner also kept the girls' passports in a safe deposit box which they could not access. (*Id.* at 33).

Petitioner then stated that in October 2002, his wife gave him custody of five girls who stayed with him, including P.H., also called Abla, and S.X., also called Sroda or Sophi. (*Id.* at 34-35). Sroda was apparently 11 years old at that time. (*Id.*). Petitioner admitted that he had sex with Abla three times, the first time only after he forced her to have sex with him by "pushing her onto the bed and [holding] her up."[1] (*Id.* at 44-45). Petitioner also admitted that he had on at least one occasion beaten Abla during the years when she lived with and worked for Petitioner. (*Id.* at 45-46). Petitioner also testified that, in March of 2006, he took Sroda with him on a three day trip to North Carolina. (*Id.* at 39). Petitioner ultimately also testified that one of the reasons he took Sroda on that trip was to have sex with her, even though he knew she was well below eighteen years of age at the time.[2] (*Id.* at 39-45). Petitioner also testified that, during that trip, he pushed Sroda onto a bed and tried to have sex with her, even though she begged him not to do so as he was old enough to be her father. (*Id.* at 40-41). Finally, Petitioner testified that he knew the conspiracy to force the girls into labor while Petitioner and his wife kept their salaries was illegal at the time of his conduct. (*Id* at 46).

Based on Petitioner's testimony during the plea colloquy and answers to the questions posed by this Court as to his understanding of the terms and consequences of his plea, as well as Petitioner's receiving extra time to discuss the plea with his lawyer in his own language through an interpreter, this Court found that Petitioner knowingly and voluntarily entered into the plea deal, and accepted Petitioner's guilty plea. (*Id.* at 48-49). Petitioner was thus permitted to plead guilty. (*Id.*).

---

[1] Petitioner initially denied forcing Abla to have sex with him, and that he transported Sroda to North Carolina so that he could have sex with her when questioned by the Government. Petitioner corrected this testimony during questioning by his attorney. (*Id.* at 35-46).

[2] Sroda was apparently between fourteen and sixteen years of age at that time. (*Id.* at 39-40).

After the entry of his guilty plea but prior to sentencing, Petitioner testified at the trial of his former wife and co-conspirator. (Docket No. 07-785 at ECF no. 167 at 15.65). During his testimony, Petitioner confirmed several of the facts stated in his plea allocution, including that he had had sexual intercourse with Abla three times, and that he had forced her to have sex on the first occasion. (*Id.* at 15.125-26). Petitioner also reiterated that he had brought Sroda with him to North Carolina so that he could have sex with her and that he did attempt to have sex with her during the trip. (*Id.* at 15.129-130). During his testimony, however, Petitioner did attempt to change some aspects of his story, specifically, he denied that "his victims were forced to work or to turn over their tips." *Afolabi*, 455 F. App'x at 186. Because of this denial, the Government therefore argued at sentencing that Petitioner should not receive the full benefit of a reduction for acceptance of responsibility. *Id.*

Petitioner appeared before this Court for his first sentencing hearing on July 12, 2010. *Id.* During that hearing, this Court again confirmed that Petitioner had entered into his guilty plea voluntarily, that he did not wish to withdraw that plea, and that Petitioner was aware of the immigration consequences of is plea:

> THE COURT: . . . Now, before today when you entered our plea of guilty, I told you that in addition to the penalties you are facing, if you are not a citizen of the United States, your guilty plea would likely result in you being subject to immigration proceedings and being deported.
>
> Do you realize, sir, that by pleading guilty you will in all likelihood be deported and also face immigration consequences as a result of your guilty plea?
>
> [Petitioner]: Yes, sir.
>
> THE COURT:   Notwithstanding that, do you want to proceed with your sentence today, even though your guilty plea would subject you to removal from the United States and other immigration consequences?

7

[Petitioner]: Yes, sir.

THE COURT: Do you understand also that due to the nature of the offense to which you pled guilty, you will also have to register as a sex offender under federal and state law?

[Petitioner]: Yes, sir.

THE COURT: And you will also be subject to the sexual offender registration law requirements and penalties, do you understand that?

[Petitioner]: Yes, sir.

THE COURT: And understanding that, do you nevertheless wish to proceed with your sentencing based on the plea of guilty you entered?

[Petitioner]: Yes.

THE COURT: Now, also at the time you entered your plea of guilty, I explained to you that the plea agreement you made with the Government is not binding on this Court. Do you remember that?

[Petitioner]: Yes, sir.

THE COURT: Do you understand, sir, that I do not have to follow the recommendations in the plea agreement in sentencing you here today?

[Petitioner]: Yes, sir.

THE COURT: Understanding that I don't have to follow the plea agreement, and understanding that you will have to register as a sex offender, and understanding that you are going to be facing immigration penalties and being deported . . . . do you nevertheless want to continue based on your plea agreement in this case?

[Petitioner]: Yes, sir.

THE COURT: You do not want to withdraw your plea agreement. Is that correct?

[Petitioner]: No sir.

THE COURT:  You wish to proceed to sentencing?

[Petitioner]:  Yes, sir.

(Docket No. 07-785 at ECF No.  197 at 7-9).

The Court of Appeals described the remainder of Petitioner's sentencing as follows:

> . . . the District Court noted that the parties' stipulated calculation of [Petitioner]'s Guidelines offense level "differ[ed] severely" from the probation department's calculations in its presentence report, which had arrived at a total offense level of 46.  The Court therefore asked each party to speak on the matter.  The government supported the plea agreement's calculation with the exception of its downward adjustment for [Petitioner]'s acceptance of responsibility. [Petitioner] agreed with the government except to the extent the government had argued that he should no longer receive the benefit of his acceptance of responsibility.  Ultimately, however, the Court concluded the parties' calculation was "flawed."  By the Court's calculation – which continued to give [Petitioner] the benefit of his acceptance of responsibility – [Petitioner]'s total offense level was 40.  At a second hearing on July 22, 2010, the Court revised its calculation to 38 "in an exercise of caution" and in light of both parties' arguments that a 2-level increase, applicable where a sexual abuse victim was in the "custody, care, or supervisory control of the defendant," U.S.S.G. § 2A1.3(b)(3), should not apply unless the victim was a minor.    [Petitioner] was sentenced within this Guidelines range to 292 months' imprisonment.

*Afolabi*, 455 F. App'x at 186.   Petitioner thereafter appealed his sentence, arguing that the

Government had breached the plea agreement by raising the calculation issue in the first hearing

and that this Court made a procedural error in calculating his Guidelines range.  *Id.* at 186-87.  The

Court of Appeals rejected both of those arguments and affirmed Petitioner's conviction and

sentence on December 16, 2011.  *Id.*  Approximately fifteen months later, Petitioner filed his

current motion to vacate his sentence, raising several claims of ineffective assistance of counsel.

(ECF No. 1).

9

## II. DISCUSSION

### A. Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence.  Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255.  Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

### B. Analysis

### 1. An evidentiary hearing is not required

A district court need not hold an evidentary hearing on a motion to vacate where "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *United States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005); *United States v. Day,* 969 F.2d 39, 41-42 (3d Cir. 1992).  "Where the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by the petitioner

or indicate[s] that petitioner is not entitled to relief as a matter of law, no hearing is required."
*Judge v. United States*, --- F. Supp. 3d ---, ---, No. 13-2896, 2015 WL 4742380, at *3 (D.N.J.
Aug. 11, 2015); *see also Government of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir.
1985); *see also United States v. Tuyen Quang Pham*, 587 F. App'x 6, 8 (3d Cir. 2014); *Booth*,
432 F.3d at 546. For the reasons set forth below, Petitioner's claims are clearly without merit
based on the record before this Court. As such, no evidentiary hearing is required for the
disposition of petitioner's motion.


## 2. Petitioner's ineffective assistance of counsel claims

Petitioner's asserts that his counsel was constitutionally ineffective. The standard for
evaluating such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test
> set forth in the Supreme Court's opinion in *Strickland v.
> Washington*, 466 U.S. 668 (1984). To make out such a claim under
> *Strickland*, a petitioner must first show that "counsel's performance
> was deficient. This requires [the petitioner to show] that counsel
> made errors so serious that counsel was not functioning as the
> 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also
> United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To
> succeed on an ineffective assistance claim, a petitioner must also
> show that counsel's allegedly deficient performance prejudiced his
> defense such that the petitioner was "deprive[d] of a fair trial . . .
> whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493
> F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper
> standard for attorney performance is that of 'reasonably effective
> assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A
> petitioner asserting ineffective assistance must therefore show that
> counsel's representation "fell below an objective standard of
> reasonableness" under the circumstances. *Id.* The reasonableness
> of counsel's representation must be determined based on the
> particular facts of a petitioner's case, viewed as of the time of the
> challenged conduct of counsel. *Id.* In scrutinizing counsel's
> performance, courts "must be highly deferential . . . a court must

11

indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge*, --- F. Supp. 3d at ---, 2015 WL 4742380 at *3-4.

Although Petitioner presents his claims as manifold, he essentially presents two arguments as to how counsel was allegedly ineffective: that counsel failed to fully investigate and prepare his defense, and that counsel pushed him to take a plea agreement he didn't adequately understand. This Court will address each in turn.

**a. Petitioner's argument that counsel was ineffective by failing to conduct a full pretrial investigation**

Petitioner first asserts that his counsel was ineffective in so much as counsel allegedly did not conduct a full investigation of the facts in Petitioner's case prior to Petitioner's guilty plea,

12

and because Petitioner asserts that he is innocent of the crimes to which he pled guilty. Under *Strickland*, counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasoanblness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. "The failure to investigate a critical source of potentially exculpatory evidence may present a case of constitutionally defective representation," and "the failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." *United States v. Travillion*, 759 F.3d 281, 293 n. 23 (3d Cir. 2014) (internal quotations omitted); *see also United States v Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (noting that a complete absence of investigation usually amounts to ineffective assistance because a complete absence of investigation does not present a strategic choice made by counsel); *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir. 1980).

Even if Petitioner can show that counsel was ineffective in failing to properly investigate his case, Petitioner must still show that he was prejudiced by that alleged failing.

> [T]o show prejudice, a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make "a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produce a different result."

*United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) ("[w]hen a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to

what the investigation would have produced"); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome" of Petitioner's case); *accord Untied States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008) (failure to investigate claimant must show that but for the inadequate investigation, there is a reasonable probability exculpatory evidence would have been found which would undermine confidence in his conviction).

The documentary evidence presented by the Government clearly establishes that this is not a case in which no investigation was conducted by counsel, in so much as counsel clearly interviewed many of the victim-witnesses in Petitioner's criminal case, and apparently met with Petitioner at least often enough to make use of a translator for thirty seven hours of "audio conversation." (*See* ECF No. 10 at 53, 121-123). Thus, Petitioner's claim is, at best, one that counsel failed to conduct an adequate investigation. While counsel's interview of the victim-witnesses certainly calls this assertion into question, this Court need not determine whether counsel's performance was inadequate because Petitioner clearly suffered no prejudice as a result of counsel's investigation.

As to prejudice, Petitioner asserts that had counsel properly investigated, he would have found that Petitioner was innocent of the charges arrayed against him. In support of this assertion, Petitioner suggests that counsel didn't understand communal living arrangements in Togo, that Petitioner didn't have sexual intercourse with the girls under his care, that the money the girls earned wasn't denied them but sent to their homes, and that counsel would have discovered that several of the girls would have testified in Petitioner's favor. As to all of Petitioner's assertions other than his claim that there were witnesses who could have testified on

14

his own behalf, Petitioner's own testimony provides a clear refutation. Petitioner admitted during his plea colloquy that he and his former wife kept the girls, forced them to work in their salons, did not pay them nor keep any tips they made, did not permit them to attend school, isolated them, and that Petitioner engaged in sexual intercourse with several of the girls, including the use of force and his transport of one under age girl out of state so that Petitioner could have sex with her. Likewise, although he denied at his wife's trial denying the girls their tips, he clearly reiterated during trial that he forced Alba into having sex with him, and attempted to do likewise with underage Sroda when he took her to the Carolinas with the purpose of having sex with her, which he attempted to do over her objections. Thus, it is clear from Petitioner's own testimony that he is guilty of all three of the counts to which he pled guilty, and his current assertions of innocence are without merit.

Indeed, because Petitioner's wife did proceed to trial, this Court need not guess at the strength of the evidence against Petitioner in the Government's possession. In affirming Petitioner's wife and co-conspirator's conviction, the Court of Appeals noted that the Government provided "overwhelming" evidence of the guilt of Petitioner's wife and her co-conspirators, including Petitioner himself. *See United States v. Afolabi*, 508 F. App'x 111, 118 (3d Cir. 2013). As an example of this overwhelming evidence, the Court of Appeals summarized the testimony of Petitioner and his wife's victims as follows: "[f]ive victims testified at trial that despite promises of schooling upon arrival in the United States, they were forced to work 60 to 100 hours per week for several years and to hand over all earnings from their hair-braiding salons where they worked. They testified that they did so because [Petitioner, his wife, and their co-conspirators] (1) separated them from their families, any school community, funds, or identifying documents; (2) threatened to deport them to Africa and to beat them violently; and

15

(3) in fact did assault and beat them, with various implements." *Id.* at 119.  Thus, it is clear that the evidence that counsel could have discovered through investigation clearly would not have supported Petitioner's current claims of innocence, but instead would overwhelmingly have established Petitioner's guilt.  Thus, it is clear that Petitioner could not show that he was prejudiced because competent investigation would clearly have revealed the staggering evidence of Petitioner's guilt.  This Court need not rely on the evidence produced at Petitioner's wife's trial other than his own testimony, however, because Petitioner's own testimony both in pleading guilty and as a witness at his wife's trial clearly establishes Petitioner's guilt and that his plea was the result of that guilt.

To the extent that Petitioner asserts that counsel would have discovered witnesses among Petitioner's victims who would have testified in his favor, Petitioner has also failed to establish that he was prejudiced.  In support of this contention, Petitioner provides only a reference to a 2008 New Jersey Star Ledger article which suggests that, during an interview arranged by one of Petitioner's family members and a lawyer working with Petitioner, four of the many victims of Petitioner's scheme claimed they weren't victims, despite admitting that they were not paid by the Afolabis for many hours of work.  (*See* Doument 3 attached to ECF No. 1).  As that article states, the girls admitted that they were kept without receiving pay for their work, and the article also points out that the girls were subject to certain pressures which could have led them to not understand their own victimization.  (*Id.* at 5-6).  In any event, the article does not identify the girls, nor does it establish in any way what testimony, if any, they would have provided.  Petitioner, likewise, fails to provide any affidavits setting forth what testimony these girls could have provided, instead providing only an unsupported assertion that they "are afraid to provide this petitioner with  a sworn affidavit" because they could get deported.  Petitioner provides no

16

further support for his claim.  Petitioner's failure to provide any affidavits setting forth the purported testimony of these supposed witnesses is fatal to his claim.  *See Judge*, --- F. Supp. 3d ---, 2015 WL 4742380, at *7 (failure to provide a sworn statement as to purported testimony prevents a petitioner from being able to show prejudice); *see also Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001) (failure to provide sworn testimony of an alleged witness is fatal to claim that counsel was ineffective for failing to interview that purported witness); *Tolentino v. United States*, No. 13-4168, 2014 WL 3844807, at *3 (D.N.J. July 31, 2014) (Petitioner's "failure to include a sworn statement regarding the nature of [a witness's] proposed testimony is fatal to his making a prima facie showing of prejudice").  In any event, because Petitioner's testimony both at his plea hearing and during his wife's trial establishes Petitioner's guilt, and because it is clear Petitioner knowingly and voluntarilly pled guilty as discussed below, he cannot show that he was prejudiced by counsel's alleged failures during pre-trial investigation.

**b. Petitioner's assertion that counsel was ineffective during plea negotiations and in advising Petitioner to plead guilty**

Petitioner also presents several arguments in which he asserts that counsel was ineffective during the plea stage of his criminal case.  As the Third Circuit has explained,

> The [Supreme] Court has re-emphasized that "[d]efendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." *Lafler v. Cooper*, [--- U.S. ---, ---, 132 S.Ct. 1376, 1384 (2012)].
>
> When addressing a guilty plea, counsel is required to give a defendant enough information "'to make a reasonably informed decision whether to accept a plea offer.'" *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir.2013) (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir.1992)), *cert. denied*, —— U.S. ——, [134 S.Ct. 1340] (2014).  We have identified potential sentencing exposure as an important factor in the decision making process, stating that

17

> "[k]nowledge of the comparative sentence exposure between
> standing trial and accepting a plea offer will often be crucial to the
> decision whether to plead guilty." *Day*, 969 F.2d at 43.  In order to
> provide this necessary advice, counsel is required "to know the
> Guidelines and the relevant Circuit precedent...." *United States v.
> Smack*, 347 F.3d 533, 538 (3d Cir.2003).  However, "an erroneous
> sentencing prediction by counsel is not ineffective assistance of
> counsel where ... an adequate plea hearing was conducted."
> [*Shedrick*], 493 F.3d [at 299].

*United States v. Bui*, 795 F.3d 363, 366-67 (3d Cir. 2015).  Any misstatements regarding

sentencing exposure, either in the form of promises as to sentence or misstatements of an

applicable sentencing range, are thus dispelled where the petitioner was informed in open court

about the maximum sentence and as to the Court's discretion in sentencing him. *Shedrick*, 493

F.3d at 299.

Here Petitioner first asserts that counsel first told him he could agree to a plea deal

involving a five year sentence, and that counsel allowed that deal to expire and Petitioner was

forced to plead under a deal involving a more severe sentence.  Petitioner, however, has provided

no proof that such an offer was ever made.  The record in this matter instead shows that the

Government originally offered a deal which would have resulted in a recommended guidelines

range of 30, two levels lower than that recommened by the deal Petitioner did sign. (*See* ECF

No. 10 at 106-13).  A range of 30 would have resulted in a sentencing range of, at a minimum 97

to 121 months, which would be  significantly longer than the five years Petitioner claims he was

offered.  Petitioner does not assert that he ever told counsel he wished to plead guilty pursuant to

that deal.  To the extent that Petitioner asserts that counsel said that he would get a better deal of

approximately five years, such an argument would fail to form a basis for habeas relief as a

criminal defendant has no right to be offered a plea deal, nor a right that a court will accept it.

*Lafler*, 132 S. Ct. at 1388.  Thus, as there is no evidence that any such deal was ever offered, and

Petitioner does not claim he would have accepted the deal involving a guidelines range of 30, Petitioner's claims regarding a five year plea deal provide no basis for relief.  *Id.*  Likewise, because Petitioner cannot show that this Court would have accepted a deal with a sentence of five years, especially considering this Court's rejection of the level 32 range recommended in the deal Petitioner did sign, Petitioner cannot show that he was prejudiced.  *See, e.g., Missouri v. Frye*, --- U.S. ---, ---, 132 S. Ct. 1399, 1409 (2012).  Indeed, even to the extent that Petitioner asserts there was a five year deal on the table, Petitioner himself states that, by the time he told counsel he was willing to accept it, the Government had already withdrawn that offer.  (*See* Document 1 attached to ECF No. 1 at 10).  As such, Petitioner cannot show that the Government was amenable to that deal, that it would have offered it, or that this Court would have accepted it, and thus cannot show prejudice.  *Id.*; *Lafler*, 132 S. Ct. at 1384-85.  As such, this claim provides no basis for relief here.

Petitioner also argues that he only accepted the plea deal that he did take because counsel improperly advised him that he faced a mandatory minimum of a thirty year sentence.  Even if counsel did make such a statement, Petitioner cannot show that he was prejudiced by it because both this Court during the plea colloquy and the plea agreement itself laid out the potential sentencing exposure Petitioner faced on the charges he was facing, this Court and the agreement explained this Court's discretion at sentencing, and this Court provided Petitioner additional time with the interpreter and counsel to rediscuss the plea agreement in detail before accepting Petitioner's guilty plea.  It is thus clear that Petitioner was provided with his sentencing exposure and information as to this Court's discretion, and thus any misstatements made by counsel as to exposure were dispelled by this Court's curative actions, including permitting more time to discuss the agreement with an interpreter present, and explaining to Petitioner this Court's

discretion. *Bui*, 795 F.3d at 367; *Schedrick*, 493 F.3d at 299. Thus, Petitioner's assertion that he was pressured into pleading because he was misadvised to the sentence he faced is without merit.

Likewise, Petitioner's claim that counsel was ineffective by failing to provide an interpreter at all meetings fails to provide a basis for relief. The record here makes it unclear how well counsel and Petitioner understood one another without an interpreter in light of counsel's assertion that they communicated well in English. That counsel did provide an interpreter for many hours of meeting conversations weakens Petitioner's claim that no translator was provided during their meetings, however. At any rate, Petitioner was not prejudiced by the lack of an interpreter specifically because this Court directly provided Petitioner with additional time, with an interpreter present, to go over Petitioner's plea agreement before Petitioner pled guilty to make sure that he understood the agreement in its entirety and had all of his questions answered by counsel while the intepreter was present. The following day, this Court accepted Petitioner's guilty plea only after he assured the Court that he and counsel, with the interpreter, had again fully discussed the agreement, that Petitioner understood the agreement, that Petitioner had had all of his questions answered to his satisfaction, and that Petitioner was satisfied with counsel's representation in regards to the plea. Thus, the record, including the additional time provided to Petitioner with counsel and the interpreter, clearly indicates that Petitioner was not prejudiced by the lack of an interpreter in other meetings as he clearly understood the agreement and knowingly and voluntarily agreed to it in open Court. Thus, this claim, too, provides no basis for relief.

Petitioner's final claim is that counsel was ineffective in failing to advise Petitioner of the collateral consequences of his guilty plea, including Petitioner's potential deportation. *See Padilla v. Kentucky*, 559 U.S. 356, 374 (2010) (holding the failure of counsel to inform his client

20

as to the potential immigration consequences of his plea can amount to ineffective assistance of counsel where the petitioner can demonstrate prejudice). Even if it were true that Petitioner was not informed by counsel of the consequences of his guilty plea, Petitioner cannot show prejudice here because both the plea agreement and this Court at both the plea hearing and sentencing made it abundantly clear that Petitioner faced several collateral consequences as a result of his plea, specifically including potential deportation. Thus, Petitioner's claim that he was unaware of these consequences because of counsel's alleged inadequate advice is belied by the record and is without merit. Petitioner was clearly informed of the immigration consequences of his plea, and counsel's failure to inform him of those consequences could not have prejudiced Petitioner.

Ultimately, Petitioner cannot show he was prejudiced by counsel's performance in reference to Petitioner's guilty plea. Not only did this Court ensure that Petitioner understood the plea he was entering and the consequences thereof, but this Court also made absolutely certain that Petitioner had enough time to discuss the agreement with both counsel and an interpreter present, including by delaying the plea hearing by a day. Likewise, this Court gave Petitioner every opportunity to move to withdraw his plea if he so desired, including by directly providing Petitioner, rather than counsel, an opportunity to do so during sentencing, after this Court re-explained what Petitioner faced and the consequences of his plea. Petitioner clearly understood the agreement during his plea hearing, and knowingly and voluntarily pled guilty. His responses to this Court's questioning at the sentencing hearing, which occurred after his testimony in his wife's trial, clearly indicated that Petitioner's plea had been knowing and voluntary, and Petitioner had no interest in retracting that plea until well after sentencing. As Petitioner was apprised of the maximum exposure he faced, this Court's sentencing discretion, and the consequences of his plea, including the immigration consequences of the plea, and

21

because Petitioner knowingly and voluntarily entered a guilty plea after being so informed, Petitioner clearly suffered no prejudice during the plea phase of his criminal matter, and his motion to vacate his sentence must therefore be denied as without merit.[3]

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c) the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because Petitioner's claims are clearly without merit, jurists of reason would not disagree with this Court's denial of Petitioner's motion, and Petitioner's claims are not adequate to deserve encouragement to proceed further. This Court thus denies Petitioner a certificate of appealability. *Id.*

---

[3] Petitioner also attempts in his reply brief to belatedly raise a claim that counsel was ineffective in failing to advise Petitioner of the potential for a bench trial rather than a jury trial. Because this claim was raised for the first time in reply, this Court need not, and will not, address this claim. *See Judge*, --- F. Supp. 3d ---, ---, 2015 WL 4742380 at *6; *D'Allessandro v. Bugler Tobacco Co.*, No. , 2007 WL 130798, at *2 (D.N.J. Jan. 12, 2007) (quoting *Int'l Raw Materials, Ltd. V. Stauffer Chem. Co.*, 978 F.2d 1318, 1327 n. 11 (3d Cir. 1992)); *Soto v. United States*, No. 04-2108, 2005 WL 3078177, at *6 (D.N.J. Nov. 16, 2005); *see also Thompson v. United States*, No. 12-1312, 2015 WL 1344793, at *6 n. 9 (D.N.J. Mar. 23, 2015); *Rodriguez v. United States*, No. 04-158, 2005 WL 2007033, at *9 n. 7 (D.N.J. Aug. 22, 2005). Even were Petitioner able to raise this claim, it is doubtful, given the strength of the evidence produced at the trial of his wife and co-conspirator, that Petitioner could possibly show that he was prejudiced by the "failure" of counsel to suggest a bench trial as a possibility.

## V.  CONCLUSION

For the reasons set forth above, Petitioner's motion is DENIED, and Petitioner is DENIED a certificate of appealability.  An appropriate order follows.

Hon. Jose L. Linares,
United States District Judge